# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**MONTGOMERY WALKER,**
        **Petitioner,**

    **v.**                                 **Case No. 18-C-0147**

**WILLIAM POLLARD, Warden,**
        **Respondent.**

---

## DECISION AND ORDER

Montgomery Walker filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. He challenges his Wisconsin conviction of first-degree sexual assault of a child, sexual intercourse with a person under age twelve. *See* Wis. Stat. § 948.02(1)(b). After resolving various preliminary matters, I appointed counsel to represent Walker and held an evidentiary hearing. The parties have filed post-hearing briefs, and this opinion contains my findings of fact and conclusions of law on the merits of Walker's claims.

## I. BACKGROUND

In August 2011, the state charged Walker with having sexual intercourse with his wife's eight-year-old granddaughter. The charge carried a mandatory minimum sentence of 25 years' imprisonment. As I explain in more detail below, the case against Walker was strong. The victim was willing to testify, Walker's semen was found on the victim's underwear, and a nurse who examined the victim found injuries that were consistent with vaginal intercourse. But Walker maintained his innocence and planned to go to trial.

Because Walker could not afford to hire counsel, the public defender's office appointed Attorney Alvin Richman to represent him. However, a few months after he was appointed, Richman filed a motion to withdraw. On November 8, 2011, the trial court held a hearing on the motion. Richman told the court that his relationship with Walker was "irreconcilable" and that "in all good conscience," he could not properly represent him. ECF No. 33-14 at 3. The court then explored whether the relationship truly had become irreconcilable. The court asked Walker about his relationship with Richman, and Walker indicated that he had asked to see paperwork related to his case that Richman did not provide. The court asked Richman if he would provide Walker with the paperwork, and Richman said that he would. Having resolved the paperwork issue, the court asked what else made the relationship irreconcilable. Richman said that it would not be fair to Walker for him to disclose that information. The court responded that it could not find the relationship irreconcilable based on counsel's conclusory assertion. The court then asked Walker if he wanted Richman as his attorney, and Walker said that he didn't think Richman could provide him with effective representation. When the court asked why not, Walker noted that Richman had waived the preliminary hearing and had confused his case with a different client's. Walker then expressed interest in retaining counsel of his choice. At that point, the court adjourned the hearing for several weeks to allow Walker to attempt to retain counsel.

On December 19, 2011, the court resumed the hearing on Richman's motion to withdraw. Walker had not been able to hire counsel of his choice, but Richman still preferred to withdraw. Richman told the court that he believed it was in Walker's best interest for the court to appoint a different attorney. The court asked Richman why he

2

thought that, and Richman again said it would not be fair to Walker to disclose his reasons. But Richman told the court that Walker had told him that he believed Richman was "working for the other side" and not properly representing him. ECF No. 33-15 at 3–4. The court asked Richman if he was willing to work for Walker and advocate for him. Richman responded: "Let me put it this way, Judge. If I'm ordered by this Court, I will. I don't think it's in Mr. Walker's best interest and not good for my health, but whatever the Judge decides to do." *Id.* at 4. When the court noted that it could not replace an attorney unless the parties could not communicate with each other, Richman responded: "Which is the case." *Id.* The court then noted that the grounds for Richman's motion were not an inability to communicate, but the "preposterous notion" that Walker thought he was working for the state. *Id.* The court asked Walker if he really thought that, and Walker said that he did not.

Walker did not immediately claim that he and Richman could not communicate. Instead, he noted that Richman had told him that he intended to withdraw and complained that Richman had not yet spoken to a defense witness. *Id.* at 4–5. On further inquiry from the court, Walker explained that the defense witness in question was his wife. Richman then stated that he had, in fact, interviewed Walker's wife. *Id.* at 6. Walker also expressed concern about Richman's not believing that he was innocent of the crime charged and about Richman's performance. At this point, the court observed that it at least sounded like Richman was willing to talk to Walker. Walker said that Richman would not talk to him on the phone and that he had hung up on him. Richman then accused Walker of hanging up on him. *Id.*

At the conclusion of the hearing, the court entered an oral ruling denying the motion to withdraw. Because this ruling is central to one of Walker's federal claims, I reproduce it in full:

> Sounds like the two of you have a hard time talking to each [other] here, but the thing is, I'm not satisfied based on what I hear that you've reached the point you're not communicating.

> Here's the thing, Mr. Walker. I think you get the idea, and a lot of people get the idea, that when the Constitution guarantees you a lawyer, you're going to get the c[h]ampion of your dreams, that you're going to get the best lawyer that you can get. That's not the guarantee. And that's for a reason that has nothing to do with the quality of lawyers.

> The Constitution wasn't designed to match people's personality. Sometimes the personality of a client and personality of a lawyer won't mesh very well, but unless it gets to the point where the two fold their arms and are unwilling to talk to each other, I don't have the authority to replace a lawyer. I could do it if I felt it was something that would give you the opportunity to talk [to] another lawyer, get a second opinion, resolve the case short of trial. But you want a lawyer to take your case to trial. That's pretty clear from what you are saying here.

> Mr. Richman can do that for you here. I see no reason why he can't. For you to get a new lawyer at this point, might give you the impression that you get to go through lawyers until you find one that agrees with your view, and that might not be the case. It may be that no lawyer could take Mr. Richman's place and do a better job.

ECF No. 33-15 at 7–8. At this point, the court asked Richman if he could think of something another lawyer would do in the case that he was not doing. Richman replied, "[n]ot at the moment." *Id.* at 8. The court continued:

> That's how this happens often. Mr. Walker, if you sat in here in my courtroom as often as I sit here, you would see this happens about once every maybe dozen-and-a-half, two dozen cases we have this issue. There's a lot [at] stake. We realize that. People have some fears about what's happening to them, and they have a belief that the lawyer is going to solve all their problems for them.

> Sometimes the lawyer can, sometimes they can't. And people get frustrated when they don't get the impression that the lawyer is going to solve all their problems. I don't know exactly what's driving your

4

> frustration, but I do know this. The frustration that I see is not a frustration with a lawyer who is unwilling to talk to you, communicate with you, and advocate for you.
>
> I believe Mr. Richman is willing [to] do that, and I'm going to deny the motion to withdraw.
>
> . . . .
>
> Mr. Walker . . . I think you understand now what standard Mr. Richman has to meet. If you believe that he's unwilling to advocate for you or unwilling to communicate with you, then if you show that to me, I will replace him.
>
> I don't want to send you to trial with someone unwilling to do the job. But Mr. Richman is not only willing to do the job, he's one of the most experienced lawyers we have in front of the court.

*Id.* at 9–10. In response to the court's ruling, Walker said, "I understand." *Id.* at 10.

During the next few months, Richman prepared Walker's case for trial. Neither Walker nor Richman returned to the court to complain about an inability to communicate or another problem that might have justified the appointment of substitute counsel. At the evidentiary hearing held before me, however, Walker presented evidence suggesting that his relationship with Richman continued to be strained. Richman, who is deceased, did not testify at the hearing. But Walker's sister, Catherine, testified that, after the court denied Richman's motion to withdraw, she began assisting Richman with Walker's defense. ECF No. 56 at 22–23. Catherine had training as a paralegal, *id.* at 6, and she helped Richman prepare motions, conduct research, and interview witnesses, *id.* at 23–24. In addition, she acted as a "mediator" for Walker and Richman and helped "squash any bad feelings between the two of them." *Id.* at 24. She "basically" acted as a "go-between" for them by relaying messages back and forth. *Id.* at 23. Walker himself testified that he and Richman were "primarily" communicating with each other through Catherine. *Id.* at 110. Walker also testified that he did not trust Richman, believed that

5

Richman did not trust him, and believed that Richman did not listen when he told him things. *Id.* at 111.

Walker's jury trial commenced on March 26, 2012. Before voir dire, the prosecutor informed the court that the state had made Walker a plea offer that Walker had rejected. The prosecutor apparently raised this point because of then-recent Supreme Court decisions; he wanted to place on the record the fact that the offer had been made and that Walker had rejected it. ECF No. 33-16 at 12. Richman asked the prosecutor to repeat the offer so that Walker could hear it again. After a break and some initial voir dire, the prosecutor informed the court that, in exchange for a guilty plea, the state would reduce the charge from first-degree sexual assault of a child to second-degree sexual assault of a child. The reduced charge would avoid the 25-year mandatory minimum, and the state agreed to recommend a sentence of four to six years. ECF No. 33-17 at 10–11. Richman told the court that he had advised Walker of this offer and that Walker had rejected it. The parties asked Walker to confirm on the record that the offer had been conveyed to him and that he was rejecting it, which he did. *Id.* at 11–12.

During voir dire, the court introduced Walker and asked all potential jurors whether any of them knew him; no jurors said that they did. ECF No. 33-16 at 23. However, according to evidence adduced at the hearing on Walker's federal habeas petition, one of the potential jurors—Kenneth Jones—had lived in the same duplex as Walker's mother for about two years and had likely encountered Walker during that time. The trial occurred in 2012, and the juror and Walker's mother lived in the same duplex from approximately August 2001 to sometime in 2003 or 2004. *See* ECF No. 56

6

at 95–96. Although Walker did not live with his mother at the duplex, he visited her there. As explained in more detail below, Walker testified at the federal hearing that he spoke to Jones on several occasions at his mother's house and that he and Jones once became embroiled in an altercation over a parking space. But during voir dire, Walker did not recognize Jones, and Jones did not inform the court that he recognized Walker.

Walker's sister Catherine and his mother, Maggie Walker, were in the gallery during voir dire. Catherine lived directly across the street from Maggie during the time when she and Jones lived at the duplex. She had seen Jones several times, including the time when he and Walker argued over the parking space. Eventually, Catherine recognized Jones and remembered the incident involving the parking space. During a break in voir dire, she approached Walker and Richman and told them whom she thought Jones was. ECF No. 56 at 26. Walker, however, said that he did not recognize Jones. *Id.* at 27. According to Catherine's testimony at the federal hearing, Richman then said that unless Walker recognized Jones there was nothing he could do about Jones's presence on the venire. *Id.* at 28.

Jones was seated as a juror, and the trial proceeded. The alleged victim testified that, at around midnight on the night of the alleged assault, she was in her room when Walker came in, carried her into the bathroom, removed her pants and underwear, and inserted his penis into her vagina. The next morning, she told her mother what had happened, and the police were called. The child was examined by a sexual assault nurse examiner. The nurse testified to having observed tears, abrasions, and redness in the genital area that were consistent with vaginal penetration. ECF No. 33-18 at 14–15.

The state also presented DNA evidence showing that Walker's semen was found on the child's underwear.

Walker testified in his own defense, and his wife also testified. Their testimony was that, on the night in question, Walker came home at about midnight and went into the kitchen to eat dinner. Walker's wife was awake in the couple's bedroom. While Walker was eating, the alleged victim entered the kitchen. Because it was late, Walker told the child to go back to bed. Walker's wife heard this from the bedroom. Walker and his wife testified that the child became angry and stomped off to her room. Walker then came to bed. His wife testified that Walker remained in bed with her all night.

Walker and his wife also offered an explanation for the semen found on the victim's underwear. The couple testified to having recently had sexual intercourse in the bathroom. Walker's wife said that, when they were done, she used a sanitary pad to wipe Walker's semen off of her and then threw it in the bathroom trashcan. Both Walker and his wife testified that the child was known to rifle through the trash and thus invited the jury to draw the inference that this was how the child's underwear became soiled with Walker's semen.

At the federal hearing, Walker testified that, while he was testifying at his criminal trial and looking at the jury, he recognized Kenneth Jones as the person who had lived in the same duplex as his mother. ECF No. 56 at 114. When he finished testifying, Walker told Richman that his sister had been right. According to Walker, Richman at first told him that he would look into it. *Id.* at 115–16. But then Richman said that it was too late to do anything. *Id.* At the end of the day's proceedings, Richman, Walker, and Walker's family were on an elevator together, and Walker and his family implored

8

Richman to do something about Jones. *Id.* at 118–19. However, Richman insisted that it was too late for him to do anything about it and then got off the elevator at the wrong floor to avoid discussing the matter further. *Id.* at 119. Walker formed the impression that Richman did not believe him. *Id.* at 118.

Richman never alerted the court to Walker's concerns over Jones, and Jones was elected foreperson of the jury. Walker was found guilty and later received the 25-year mandatory minimum sentence.

After Walker was convicted and sentenced, the public defender appointed Attorney Urszula Tempska as his postconviction/appellate counsel.[1] At the federal hearing, Walker testified that he told Tempska about his history with Jones. ECF No. 56 at 121. Tempska, who also testified at the federal hearing, confirmed that Walker had told her about Jones. ECF No. 55 at 20. Tempska then investigated the issue by interviewing Richman about it. *Id.* at 21. Richman confirmed that Walker told him he recognized the juror, and Richman told Tempska that he did not act on this information because he did not think it would have warranted special voir dire of the juror or a motion for a mistrial. *Id.* at 27–28. After talking with Richman, Tempska formed the impression that Richman believed that Walker was "grasping at straws" at the end of the

---

[1] In Wisconsin, to raise certain issues on appeal, including claims of ineffective assistance of trial counsel, a defendant must file a motion for postconviction relief in the trial court before proceeding with a direct appeal. *See, e.g. State ex rel. Rothering v. McCaughtry*, 205 Wis. 2d 675, 677–78 (Ct. App. 1996). Often, the lawyer who represents the defendant in the court of appeals will also be the lawyer who files the postconviction motion, and Wisconsin cases will often refer to the same lawyer as both "postconviction counsel" and "appellate counsel." In the present case, Tempska represented Walker during the postconviction and appellate stages of direct review.

trial because he began to realize for the first time that he might not be acquitted. *Id.* at 28.

In deciding which issues to raise in a postconviction motion and on appeal, Tempska concluded that Richman had correctly handled the juror issue, and that an ineffective-assistance claim based on the issue would lack merit. ECF No. 55 at 31–32. Tempska concluded that there were no grounds to argue that Richman had performed deficiently in not bringing Walker's concern with the juror to the court's attention; she thought that Richman's inaction was reasonable because she "probably . . . would have done the same in his position." *Id.* at 32. Tempska also concluded that, based on her understanding of the law, Walker could not have succeeded on a claim of jury bias unless he proved that the juror was actually biased against him. *Id.* at 32–33. Tempska understood the law to mean that, even if the juror might objectively be seen as biased, he could not be removed from the jury if he swore that he could be fair and impartial. *Id.* And Tempska believed that Jones had actually stated in open court that he could be fair and unbiased. *Id.* at 31–32. For these reasons, Tempska believed that an ineffective-assistance claim based on jury bias might be "frivolous," that she could not "conceivably succeed on that issue," and that raising the issue on appeal would be a waste of time and pleading space. *Id.* at 33–34.

Having decided to abandon the jury bias issue, Tempska raised two other claims in Walker's postconviction motion and on appeal. First, she argued that the trial court had abused its discretion when it denied Richman's motion to withdraw. Tempska argued that the record at the hearing established that Walker and Richman could not effectively communicate and that the trial court wrongly denied the motion, which

10

resulted in an inadequate defense. Second, Tempska argued that trial counsel rendered ineffective assistance during plea negotiations by failing to ensure that Walker understood the definition of "sexual intercourse" as defined in the charged crime.

The trial court denied Walker's postconviction motion without holding a hearing, and the court of appeals affirmed Walker's conviction. The Wisconsin Supreme Court denied discretionary review.

After his direct appeal was over, Walker, now proceeding pro se, filed a state application for collateral review under Wis. Stat. § 974.06. In this motion, Walker for the first time alerted a court to Kenneth Jones's potential bias. Walker alleged that his trial counsel was ineffective in failing to raise jury bias as an issue when it arose during the trial, and that his postconviction/appellate counsel was ineffective in failing to raise trial counsel's ineffectiveness in this regard as an issue on direct review. The trial court denied Walker's § 974.06 motion without holding an evidentiary hearing. Walker then appealed, but the court of appeals affirmed, and the Wisconsin Supreme Court denied review.

Having completed collateral review in state court, Walker filed his pro se federal petition, in which he alleged three claims. First, he alleged that the trial court's denial of Richman's motion to withdraw deprived him of his Sixth Amendment right to counsel because the record showed that communication between him and Richman had completely broken down. Second, he alleged that counsel provided ineffective assistance during plea negotiations by failing to ensure that Walker understood how the statutory definition of sexual intercourse applied to his case. Third, he alleged that both

trial counsel and appellate counsel rendered ineffective assistance by failing to raise Juror Jones's potential bias during the trial and on direct review.

In prior orders, I resolved various procedural matters and rejected Walker's first and second claims on the merits. *See* ECF Nos. 29 & 41. However, as to Walker's ineffective-assistance claims involving juror bias, I determined that the Wisconsin Court of Appeals, in rejecting the claims on the merits, had rendered a decision that was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d)(1). Because the state courts never held a hearing on Walker's allegation of juror bias, I set this matter for an evidentiary hearing. I also asked the Federal Defender Services of Wisconsin, Inc., to appoint counsel to represent Walker.

At the hearing,[2] Walker presented evidence concerning his ineffective-assistance claims based on juror bias and evidence concerning his claim that communication between him and Richman had completely broken down. Although I had previously dismissed the breakdown-in-communication claim on the merits based on Walker's pro se submissions, Walker asked me to reconsider the issue now that he had the benefit of counsel, and I granted his request.[3]

At the hearing, I heard testimony from Walker, his mother, his sister, and Attorney Tempska. As noted, Attorney Richman is deceased, and therefore he did not testify. Kenneth Jones, the allegedly biased juror, also testified. I have described much

---

[2] The evidentiary hearing was held on two separate days in January 2020.

[3] Walker did not ask me to reconsider my dismissal of his third claim—that trial counsel had rendered ineffective assistance during plea negotiations—and thus my dismissal of that claim stands.

12

of the relevant testimony above. Here, I describe the testimony relating to Walker's interactions with Jones prior to trial.

The testimony established that Walker's mother and Jones lived in the same duplex from about August 2000 to sometime in 2003 or 2004. Walker's sister Catherine testified that she lived across the street from the duplex and knew that Jones lived in the upper unit. She saw him there and occasionally interacted with him. She testified that she observed Walker interact with Jones on a few occasions, including when Walker and Jones argued over the parking space. Catherine testified that, when the argument occurred, she was in her garden across the street and could see and hear the men arguing loudly. Although Catherine did not hear everything that was said, she could tell that they were arguing about Jones's car blocking the driveway. Catherine testified that she heard Walker threaten to retrieve a tow chain from his truck and use it to move Jones's car. After that, Catherine went back to her gardening and did not see how the dispute ended.

Catherine also testified to having her own confrontation with Jones at a neighborhood bar. According to Catherine, she and a friend were sitting at a table when Jones approached them and asked Catherine's friend for a cigarette. When her friend said she would give him a cigarette only if he paid her two dollars, an argument ensued. Staff at the bar eventually asked Jones to leave. Catherine and her friend left at about the same time, and then the argument continued as each party walked down the street to their respective homes.

Case 2:18-cv-00147-LA   Filed 10/14/20   Page 13 of 33   Document 65

Walker's mother, Maggie Walker, also testified at the hearing. She testified that Jones lived upstairs from her and that he once helped her with her computer. She did not remember whether Jones and Walker ever interacted. She remembered that Jones once blocked her access to the driveway with his car, but she did not remember Walker and Jones having a dispute about it. At Walker's trial, Maggie did not recognize Jones at first. However, after Catherine pointed him out and Jones stood up to identify himself during voir dire, she recognized him and tried to waive at him. She testified that, after she waived, Jones turned his head but did not otherwise react.

Walker also testified about his previous interactions with Jones. He confirmed that Jones lived upstairs from his mother and that he and Jones would regularly see each other when he visited his mother. Walker identified several instances in which he and Jones conversed cordially. Walker testified that, based on his interactions with Jones, he thought Jones was a loner and that he might be gay. ECF No. 56 at 105.

As for the altercation itself, Walker testified that it happened shortly after his mother unexpectedly did not meet him at his workplace. Walker became concerned and drove to the duplex. When he arrived, his mother said that she could not drive to meet him because Jones had blocked the driveway with his car, which prevented her from using her own car. Walker then went to the door of Jones's unit and knocked. When Jones did not immediately answer the door, Walker began kicking at the door. Eventually, Jones came outside, and the two men began arguing. The argument became heated, with both men using profanity and Walker's using a homosexual slur. Eventually, Walker went to his truck and removed a tow chain and threatened to forcibly move Jones's car. According to Walker, Jones then told Walker that he was going to

14

"blow [his] M.F. head off." ECF No. 56 at 109. Walker said that his mother came outside at about this time and told Walker to leave. *Id.* Walker left, and the dispute ended. After the incident, Walker avoided visiting his mother at the duplex.

Kenneth Jones also testified. He stated that he lived in the upper unit of the duplex in question for about three or four years, but that he could not remember exactly when that was. He stated that, while he lived there, he worked second and third shifts and did not see his neighbors much. ECF No. 56 at 62. He did not remember Maggie Walker living in the unit below him; the only downstairs tenants he remembered were "the Mims." *Id.* He did, however, remember Catherine Walker as his neighbor who lived across the street. He did not remember the name Montgomery Walker. *Id.* at 63. Jones remembered parking in the driveway of the duplex, but he did not remember ever getting into a dispute with anyone over the parking situation. *Id.* at 65. Jones remembered getting into a heated argument with the people who lived in the house next door about one of their guests, but he did not remember having an argument with Walker.

Jones also testified that he was one of the jurors at Walker's trial. He testified that, during the trial, he did not recognize Walker from any prior interaction and that he did not recognize Catherine or Maggie Walker in the gallery. Jones was quite emphatic on this point and reiterated several times during his testimony that he did not recognize Walker or his family members during the trial. *See* ECF No. 56 at 67–68, 70, 75–76, 90–91, 92–93. Jones testified that if he had recognized any participant in the trial, he would have "recused" himself from the case. *Id.* at 68. Jones testified that serving as a

juror was "very, very inconvenient" and that he would have immediately spoken up and told the judge if he had recognized Walker as someone he knew. *Id.* at 69.

After the evidentiary hearing, the parties filed briefs on the merits of Walker's surviving two claims. I address these claims below.

## II. DISCUSSION

### A.    Sixth Amendment Right to Counsel

Walker first claims that he is entitled to habeas relief because the trial court deprived him of his Sixth Amendment right to counsel when it denied Attorney Richman's motion to withdraw, forcing him to be represented by an attorney with whom he could not effectively communicate. Walker contends that, in adjudicating this issue, the state courts rendered decisions that were based on an unreasonable determination of the facts, and that therefore a federal habeas court may grant relief even though the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies to the claim. *See* 28 U.S.C. § 2254(d)(2).

I begin by identifying the relevant federal law. In state court, Walker primarily argued that the trial court had abused its discretion in applying the Wisconsin standard governing motions to substitute appointed counsel. *See* ECF No. 33-2 at 29–37 (Walker's appellate brief at pp. 24–32). Under that standard, the court must consider a variety of factors, including "whether the alleged conflict between the defendant and the attorney was so great that it likely resulted in a total lack of communication that prevented an adequate defense and frustrated a fair presentation of the case." *State v. Jones*, 326 Wis. 2d 380, 398 (2010) (quoting *State v. Lomax*, 146 Wis. 2d 356, 359 (1988)). On direct review, Walker did not develop an argument under the Sixth

16

Amendment that focused on federal cases. But the state standard is itself based on the constitutional right to counsel, *see State v. Jones*, 326 Wis. 2d 380, 397 (2010) (describing standard governing motion for substitution and describing court's review as involving question of "whether deprivation of a constitutional right has occurred"), and thus his argument implicated the Sixth Amendment right to counsel. Still, as Walker concedes, *see* ECF No. 60 at 21, there is no Supreme Court case holding that a court's refusal to replace counsel with whom the defendant cannot effectively communicate violates the Sixth Amendment.

Under federal law as interpreted by the Seventh Circuit, a trial court's erroneous denial of a motion to substitute appointed counsel will give rise to a constitutional violation only if the defendant can also show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). *See, e.g., United States v. Wallace*, 753 F.3d 671, 675 (7th Cir. 2014); *United States v. Volpentesta*, 727 F.3d 666, 673 (7th Cir. 2013); *United States v. Ryals*, 512 F.3d 416, 419 (7th Cir. 2008); *United States v. Harris*, 394 F.3d 543, 552 (7th Cir. 2005). The *Strickland* standard requires a defendant to prove that counsel performed deficiently and that the defendant suffered prejudice as a result. 466 U.S. at 687–94. However, the Supreme Court has held that, in three situations involving the denial of counsel, a defendant does not need to independently satisfy the *Strickland* standard to establish a Sixth Amendment violation. *See United States v. Cronic*, 466 U.S. 648, 658 (1984). The first is when a defendant is denied the presence of counsel at a critical stage of the proceedings. *Id.* at 659. The second is when counsel "entirely" fails "to subject the prosecution's case to meaningful adversarial testing." *Id.* And the third is when

17

circumstances that are likely to prevent any lawyer, "even a fully competent one," from providing effective assistance occur. *Id.* at 559–60.

Based on *Cronic* and related Supreme Court cases, some circuits have held that when a trial court denies a defendant's motion for substitution of appointed counsel, and the defendant is forced to go to trial with counsel with whom he cannot communicate, the defendant has established a Sixth Amendment violation and does not need to independently establish that his counsel performed deficiently and that he suffered prejudice as a result. *See United States v. Holloway*, 939 F.3d 1088, 1097–98 (10th Cir. 2019); *United States v. Smith*, 940 F.3d 580, 587–90 (2d Cir. 2011); *Daniels v. Woodford*, 428 F.3d 1181, 1197–98 (9th Cir. 2005); *see also Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970) (pre-*Strickland* case holding that "to compel one charged with grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever"). The Seventh Circuit, however, has expressly stated that these out-of-circuit cases are contrary to its own decisions. *Wallace*, 753 F.3d at 675.

Walker contends that the Seventh Circuit has not been confronted with a case involving a "total breakdown of communication," and that, in such a case, the court might be inclined to follow the out-of-circuit cases. ECF No. 60 at 22. However, several of the Seventh Circuit cases cited above involved claims that communication between lawyer and client had completely broken down. In *Wallace*, the "ground of the request [for substitution] was that communication had broken down between the defendant and his existing counsel." 753 F.3d at 675. After noting this, the Seventh Circuit stated that a

18

communication breakdown could result in a Sixth Amendment violation only if the defendant proved that he received ineffective assistance under *Strickland*. *Id.* In *Volpentesta*, the court considered "whether a total breakdown in communication between Volpentesta and his attorneys prevented an adequate defense" and required the defendant to prove ineffective assistance under *Strickland*. 727 F.3d at 673. The court even noted that "the amount and quality of communication between Volpentesta and his attorneys . . . is itself but one facet of the general inquiry into whether counsel was effective." *Id.* at 674. Finally, in *Ryals*, the court found that communication between the defendant and his counsel had completely broken down, 512 F.3d at 420 (noting that "Ryals and his attorney were not simply disputing a tactic or two and otherwise collaborating on his defense . . . they were standing apart from each other with folded arms"), but it granted relief only after finding that the breakdown in communication resulted in prejudice under *Strickland*, *see id.* at 419, 421. Thus, under Seventh Circuit law, a communication breakdown does not on its own establish a Sixth Amendment violation; the defendant must also prove that the lack of communication resulted in deficient performance and prejudice.

Walker contends that, even if he must prove that the breakdown in communication resulted in deficient performance and prejudice, he is entitled to relief. That is so, he contends, because Richman rendered ineffective assistance in failing to raise his concerns over Juror Jones with the court. But Walker has separately brought an ineffective-assistance claim based on Richman's failure to raise those concerns. If Walker must prevail on that ineffective-assistance claim in order to prevail on his

breakdown-in-communication claim, then the breakdown-in-communication claim is unnecessary.

In any event, even under Walker's view of the law, he could obtain habeas relief on his breakdown-in-communication claim only if he established that the state courts unreasonably determined—based on the state-court record—that communication between him and Richman had not completely broken down. *See* 28 U.S.C. § 2254(d)(2). A decision involves an unreasonable determination of the facts if it rests upon fact-finding that ignores the clear and convincing weight of the evidence. *Taylor v. Grounds*, 721 F.3d 809, 817 (7th Cir. 2013). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). In examining whether the state courts unreasonably determined the facts, I focus on the evidence available to the trial court when it ruled on Richman's motion to withdraw. This is so because the hearings on that motion are what comprise the relevant "State court proceeding" under § 2254(d)(2) for purposes of this case.[4]

At the initial hearing on the motion, Richman told the court that his relationship with Walker was "irreconcilable" and that "in all good conscience," he could not properly represent him. ECF No. 33-14 at 3. But Richman was unwilling to provide details about what made the relationship irreconcilable. He noted that answering the court's questions

---

[4] Walker notes that Tempska filed a postconviction motion on this issue and asked for an evidentiary hearing. However, the postconviction court could have taken evidence at the hearing only if it first determined that the trial court had failed to conduct an adequate inquiry at the time it denied the motion to withdraw. *See State v. Lomax*, 146 Wis. 2d 356, 365 (1988). Thus, before I may consider new evidence of a breakdown in communication, I must find that the trial court unreasonably determined the facts based on the evidence presented at the hearings on the motion to withdraw.

in that regard would have been unfair to Walker. The court then addressed Walker, who raised a concern about not receiving paperwork from Richman. The court promptly resolved that concern and then asked what else was wrong. Walker did not say that he was unable to communicate with Richman. Instead, he questioned Richman's decision to waive the preliminary hearing and complained that Richman had confused his case with another client's. The hearing ended when Walker asked for time to retain counsel of his choice.

At the second hearing, Richman again stated that he wanted to withdraw but refused to disclose the underlying problem that caused him to file the motion. He noted that Walker believed that he was working for the state, but when the trial court asked Walker about that accusation, he said he did not really think that Richman was disloyal. Richman then claimed that he and Walker could not communicate, but again he did not provide any details. Walker did not immediately claim that he could not communicate with Richman. Instead, he noted that Richman had not interviewed his wife and did not appear to strongly believe in his innocence. The only communication issue that Walker raised was that, on one occasion, Richman hung up the phone on him. Walker did not assert that communication between him and Richman had completely broken down. The trial court then asked Richman if he was willing to advocate for Walker, and he said yes—although he also made it clear that he preferred not to. The trial court asked Richman whether another lawyer would do anything differently than Richman to defend Walker, and Richman said that he did not think so.

21

Based on this record, I cannot say that the trial court made factual findings that were against the clear and convincing weight of the evidence. Although the record makes clear that Walker and Richman butted heads and that Richman preferred to withdraw, it does not contain information showing that a reasonable judge would be compelled to find that communication had completely broken down. *Cf. Volpentesta*, 727 F.3d at 673 ("While it is apparent from the record that Volpentesta and his attorneys frequently butted heads, there is scant evidence that the gulf of communication so widened as to constitute a total breakdown. The fact is that Volpentesta [and his attorneys] were communicating, but simply disagreeing."). To be sure, Richman asserted that communication had broken down, but he did not elaborate or show that the lack of communication was preventing him from preparing an adequate defense. To the contrary, when the court inquired about Richman's ability to defend Walker, he stated that he could do it (even though he preferred not to) and that he couldn't think of anything another attorney would do differently. Walker never claimed that communication had completely broken down; he only noted that Richman once hung up on him. Walker did not tell the trial court that he did not trust Richman or that he would refuse to consider Richman's advice about important matters such as whether to accept a plea offer or whether to take the stand at trial. Nor did he say that he thought Richman would refuse to communicate with him about these matters or any others.

Walker claims that the trial court based its finding that communication had not broken down on the fact that it observed Walker and Richman talking to each other in court. ECF No. 60 at 19. However, the record shows that this was not the basis for the court's finding. The remark Walker cites occurred after the court noted that it could not

22

replace appointed counsel unless the parties could not communicate with each other. ECF No. 33-15 at 4. When Richman interjected, "Which is the case," the court said, "I see you talking back and forth right now." *Id.* But the court did not end its inquiry on that note. It continued its statement by observing that neither Richman nor Walker had previously complained about an inability to communicate. The court then asked Walker about his concerns with Richman and explored them fully. The court based its ruling on the correct factor: whether the evidence in the record showed that communication had broken down to the extent that it would prevent an adequate defense. *See Jones*, 326 Wis. 2d at 398. And because Richman stated that he could prepare an adequate defense even though he and Walker disagreed over certain matters, the court did not act unreasonably in finding that the parties had not shown that substitute counsel was required. Notably, the Constitution does not guarantee a meaningful attorney-client relationship. *Morris v. Slappy*, 461 U.S. 1, 13–14 (1983). Thus, the various disagreements and unpleasantries that arose between Walker and Richman were not, by themselves, cause for granting a substitution.

Walker likens this case to *Carlson v. Jess*, 526 F.3d 1018 (7th Cir. 2008). That case involved a denial of the Sixth Amendment right to counsel of choice, which is not a right that applies to indigent defendants, like Walker, who require appointed counsel. *Id.* at 1024–25. Still, *Carlson* is relevant here because the Seventh Circuit determined that a state court unreasonably determined the facts when it found that communication between the defendant and his existing attorney had not completely broken down. *See id.* at 1023–24. However, the situation in *Carlson* was materially different from the situation here. In *Carlson*, both the attorney and the client repeatedly told the court that

23

their communication had completely broken down, but the trial court failed to explore these assertions by asking follow-up questions. *Id.* at 1024. Further, the trial court found that the parties had "discussed witnesses" even though the client expressly said that he had "heard nothing" about his request that counsel interview witnesses. *Id.* The Seventh Circuit deemed the trial court's finding that communication had not broken down "clearly unreasonable" because there was "nothing in the record to back it up." *Id.*

Here, in contrast, the trial court did not reject Richman's assertion that communication had broken down without asking follow-up questions. Instead, the court noted that the basis for Richman's motion was not a breakdown in communication and that the parties had yet to provide details showing that such a breakdown had occurred. The court then explored the specific concerns that the parties had raised, and it even asked Walker an open-ended question that gave him the opportunity to state that a breakdown in communication had occurred. *See* ECF No. 33-15 at 6 ("Mr. Walker, what other concerns, if any, do you have with Mr. Richman?"). Walker did not take this opportunity to identify such a breakdown but instead noted that Richman had made unfair statements about the alleged victim. *Id.* Further, at the end of the hearing, the court told Walker that he could return to court and obtain new counsel if, as the case progressed, he could show either that Richman was unwilling to communicate with him or unwilling to advocate for him. *Id.* at 9–10. Walker said that he understood this. *Id.* Thus, unlike the trial court in *Carlson*, the trial court here did not brush off the parties' claims that communication had broken down or make findings on an empty record. It explored the relevant issues and rendered a decision that was reasonable based on the answers the parties provided.

24

For these reasons, I conclude that the state courts did not render decisions that were based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. I therefore may not consider the additional evidence of a communication breakdown that Walker presented at the federal hearing. However, I note that, even if I could consider such evidence, I would not conclude that communication between Walker and Richman had broken down to the point that it impaired Richman's ability to present an adequate defense. Walker testified that he and Richman were communicating primarily through Catherine, and Catherine testified that, in the course of assisting Richman as a paralegal, she mediated the parties' disputes and helped "squash any bad feelings between the two of them." ECF No. 56 at 24. Obviously, it would have been better had Walker and Richman been able to communicate without Catherine's assistance, but the fact is that Catherine did assist, and it appears that her assistance enabled Walker and Richman to communicate to the extent necessary to prepare the defense. Richman presented Walker's defense that he was in bed all night and that his wife's sanitary pad was the source of the semen. He would not have been able to do these things without receiving information from Walker. Moreover, when he testified, Walker did not describe any specific way in which an inability to communicate with Richman impaired his defense. Walker did not claim that Richman refused to counsel him about the state's plea offer or about whether he should testify. And notably, when the trial court denied Richman's motion to withdraw, it told Walker that it would consider appointing new counsel if Walker wanted a second opinion about taking a plea. ECF No. 33-15 at 8, 9–10. Thus, Walker was aware that if

25

he deemed Richman's advice untrustworthy, the trial court would consider replacing him. But Walker never raised that issue before trial.

The only time when a lack of communication or trust may have affected the defense is when Richman refused to bring Walker's concerns with Juror Jones to the court's attention. The testimony at the evidentiary hearing supports the conclusion that Richman did not do so, in part, because he did not believe that Walker actually recognized the juror and was only grasping at straws at the eleventh hour once he realized he might not be acquitted. But, as I have already noted, Walker has brought a separate claim of ineffective assistance related to this issue, and so he does not need to also prove that the failure to challenge the juror stemmed from a breakdown in communication. In any event, I could not find from this single instance in which a lack of communication may have impacted the defense that Walker was denied the assistance of counsel altogether.

Based on the entire state and federal record, it seems to me that Walker's primary concern with Richman was that he did not strongly believe in his innocence. But a lawyer is not required to believe his client is innocent in order to present an effective defense. Indeed, because the state's evidence showed that Walker was almost certainly guilty, Richman would have been doing Walker a disservice by feigning a strong belief in his innocence. Any competent lawyer would have told Walker that his chances of acquittal were slim and that it was in his best interest to accept a plea to a lesser offense to avoid the mandatory minimum. Of course, if Richman's insistence that Walker plead guilty prevented him from presenting an adequate defense, then Walker would have been entitled to substitute counsel. But, as discussed, Richman told the trial

court that he could properly defend Walker even though he preferred to withdraw, and at trial Richman cross-examined witnesses and presented Walker's defense as well as any lawyer could.[5]

Accordingly, I will not grant Walker habeas relief on his breakdown-in-communication claim.[6]

## B. Ineffective Assistance in Failing to Raise Potential Juror Bias

Walker claims that his appellate counsel, Tempska, was ineffective in failing to raise as an issue on direct review Richman's ineffectiveness in failing to challenge Juror Jones. In his post-hearing brief, Walker does not separately discuss his claim of ineffective assistance of trial counsel based on Richman's failure to challenge Juror Jones. However, he raised that claim in his petition, *see* ECF No. 1 at 8, and, as noted above, he asserts the claim indirectly as part of his breakdown-in-communication claim, *see* ECF No. 60 at 25. Thus, I understand Walker to be seeking habeas relief in connection with the juror issue via both forms of ineffective assistance. As I explained in my last decision, the Wisconsin Court of Appeals rejected these claims based on a

---

[5] At the federal hearing, Walker's counsel asked Juror Jones for his opinion of Richman's performance at trial, and Jones testified that Richman did not effectively counter the prosecution's case. ECF No. 56 at 88–89. But a lay person's opinion about a lawyer's effectiveness is not relevant to whether the lawyer performed effectively. Further, it must be remembered that the state had a very strong case, and that there was not much Richman could have done to counter the prosecution's evidence. Thus, it is unlikely that *any* defense attorney would have impressed Jones.

[6] In his post-trial brief, the respondent argues that Walker procedurally defaulted his breakdown-in-communication claim by not fairly presenting it to the Wisconsin Supreme Court. Because I am rejecting this claim on the merits, I do not separately address whether the claim was defaulted. *See Carrion v. Butler*, 835 F.3d 764, 772 & n.26 (7th Cir. 2016) (court may reject collateral attack on the merits without addressing procedural defenses).

27

decision that was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. *See* ECF No. 41 at 43. Therefore, I review the claims de novo.

Because the claim of ineffective assistance of appellate counsel is based on Tempska's failure to raise the claim of ineffective assistance of trial counsel, I begin by addressing the merits of the latter claim. The claim is governed by the standard in *Strickland v. Washington*, 466 U.S. 668 (1984). Under the first prong of the *Strickland* standard, Walker must show that counsel's performance was deficient. *Id.* at 687. This requires showing that counsel made errors so serious that he was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Id.* Counsel's performance is judged by an objective standard of reasonableness that is based on prevailing professional norms. *Id.* at 687–88. The court must "determine whether, in light of all the circumstances, [counsel's] acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690.

Here, I find that Richman's failure to alert the court to Walker's history with Juror Jones was deficient performance. If, as both Walker and his sister told Richman, Jones and Walker knew each other and were once involved in a dispute, then Richman had grounds to believe that Jones may have been biased. Catherine informed Richman of these issues during voir dire, when it would have been easy for Richman to act on the information by alerting the court to what Catherine had told him. Richman's response— that he could not act unless Walker himself recognized Jones—does not make sense. Richman could have told the court that Walker's family recognized the juror, and then the court could have taken Jones into chambers and explored the issue further. And I

28

find that a reasonable attorney confronted with these circumstances would have informed the court that the defendant's family recognized the juror. Indeed, a juror's knowing one of the parties to the case is a serious issue, which is why at the start of every jury trial, the court identifies the parties and the lawyers and asks the potential jurors whether they know any of the case participants. Perhaps if Richman had a reason for preferring that Jones serve on the jury, his failure to raise this issue with the court could be described as reasonable. But no person testified at the hearing that Richman or Walker preferred that Jones serve on the jury. *See* ECF No. 55 at 28 (Tempska was unaware of strategic reason for not challenging Jones); ECF No. 56 at 28–29 (Catherine testifies that neither Walker nor Richman said they wanted Jones on the jury). Thus, I find that Richman performed deficiently by not alerting the court to the possibility that Jones and Walker were acquainted.

As for prejudice, the usual inquiry is whether there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. Here, however, Richman's error may have resulted in the seating of a biased juror. As I explained in my last opinion, the seating of a biased juror is structural error that calls the fundamental fairness of the proceeding into question. *See* ECF No. 41 at 31-33. Thus, if a defendant shows that counsel's unprofessional errors resulted in the seating of a biased juror, the defendant has satisfied *Strickland*'s prejudice prong and does not have to also demonstrate a

Case 2:18-cv-00147-LA   Filed 10/14/20   Page 29 of 33   Document 65

reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different. *See Virgil v. Dretke*, 446 F.3d 598, 613–14 (5th Cir. 2006).[7]

I thus ask whether Walker has shown that Juror Jones was biased. In making this determination, I focus on the evidence received at the federal hearing. There, Walker and his sister testified that Jones and Walker interacted several times at Walker's mother's house and that they were involved in the dispute over the parking space, during which Jones threatened to blow Walker's head off. However, Jones testified that, at the trial, he did not recognize Walker or his family or remember a dispute over a parking space. He further testified that, to this day, he does not remember Walker's mother living below him and that he does not remember getting into a dispute with Walker.

If Jones did not recognize Walker or his family at the trial or recall that he and Walker were once involved in a dispute, then Jones could not have been biased. And I find Jones's testimony that he did not remember the Walkers or the dispute credible. I

---

[7] Citing *Weaver v. Massachusetts*, __ U.S. __, 137 S. Ct. 1899 (2017), the respondent contends that the Supreme Court has indicated that a defendant must show a reasonable probability of a different outcome even when counsel's deficient performance results in structural error. However, the structural error in *Weaver* was the denial of the right to a public trial, and the Court determined that the specific violation of that right in the case before it did not call the trial's fundamental fairness into question. *Id.* at 1913. The Court did not address whether a structural error that calls the trial's fundamental fairness into question would automatically result in prejudice under *Strickland. Id.* at 1911 (assuming, but not deciding, that "under a proper interpretation of *Strickland*, even if there is no showing of a reasonable probability of a different outcome, relief still must be granted if the convicted person shows that attorney errors rendered the trial fundamentally unfair"). The present case involves the denial of the right to an impartial decisionmaker, which clearly implicates fundamental fairness. *See, e.g., Irvin v. Dowd*, 366 U.S. 717, 721–22 (1961). Thus, *Weaver* does not suggest that, to prevail here, Walker must satisfy *Strickland*'s "reasonable probability" formulation of prejudice.

observed Jones's demeanor while testifying, and he appeared to be testifying truthfully. Moreover, it is reasonable to think that Jones would fail to recognize a person with whom he had interacted only a few times nearly ten years before the trial. Indeed, Walker did not immediately recognize Jones, and he likely never would have if Catherine did not say something.[8] Finally, it is highly unlikely that Jones would lie about these matters. Jones testified that he found jury service very inconvenient, and thus he had a reason to bring his knowledge of Walker to the court's attention. It is far-fetched to think that Jones would have hid his knowledge of Walker so that he could use his jury service as a form of revenge for Walker's behavior during the dispute over the parking spot that occurred ten years earlier.

Walker urges me to find Jones incredible because, by the time of the federal hearing, Jones had been interviewed by the parties' investigators and learned that he was being accused of having been biased. ECF No. 60 at 31. But I fail to see why Jones's knowledge of the accusation provides a motive to lie. Perhaps if Jones really was biased in 2012 (when the trial occurred), he would have had a motive to lie in 2020 (when the federal hearing occurred) to cover his tracks. But this just shifts the focus to 2012, and there is no plausible motive for Jones to have lied about knowing Walker then. As I have noted, it is far-fetched to think that Jones would have hid his knowledge of Walker so that he could use his jury service as a form of revenge. Walker also contends that Jones might have wanted to lie in 2020 because he did not want to admit

---

[8] Walker testified that he did not recognize Jones because Jones had grown a beard since he had last seen him. ECF No. 56 at 126. Still, this only highlights the fact that people's appearances can change in ways that makes them hard to recognize when they are encountered many years later and in a different context.

Case 2:18-cv-00147-LA   Filed 10/14/20   Page 31 of 33   Document 65

to having made a threat of gun violence or to having engaged in the other acts that allegedly occurred during the dispute. But Jones would not have had to admit that all the details occurred exactly as Walker described them to admit that he remembered Walker or the dispute at the time of trial. In any event, I do not think that a desire to hide these details provides a plausible motive to commit perjury.

Walker also contends that Jones's testimony was incredible because he claimed not to remember Walker's mother, whom he lived above for at least two years. However, I think it is reasonable for a person to fail to recognize a former neighbor after not seeing the neighbor for nearly ten years, especially when the person and the neighbor did not frequently interact, as was the case here, and the person encounters the neighbor in a new context. Jones also explained that, at the time of trial, he was focused on the defendant and what was happening in court rather than on who was seated in the gallery. ECF No. 56 at 67, 92. Thus, Jones's testimony that he did not recognize Walker's mother or Catherine at the time of trial is not suspicious.

Because I find that, at the time of trial, Jones did not recognize Walker, and that therefore he was not biased, I conclude that Richman's deficient performance did not result in a trial that was fundamentally unfair. Accordingly, I will deny Walker's request for habeas relief on his claim of ineffective assistance of trial counsel. Because Walker's claim of ineffective assistance of appellate counsel depends on his claim that trial counsel was ineffective, my finding that Jones was not biased also disposes of the challenge to Tempska's effectiveness. More specifically, I find that there is no reasonable probability that, had Tempska raised Richman's failure to raise Walker's concerns with Jones, the state postconviction court would have found that Jones was

32

biased. Thus, regardless of whether Tempska performed deficiently in failing to raise this issue, Walker is not entitled to habeas relief on this claim.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that Montgomery Walker's petition for a writ of habeas corpus is **DENIED**. The Clerk of Court shall enter final judgment. Pursuant to Rule 11 of the Rules Governing § 2254 Cases, I find that the petitioner has not made the showing required by 28 U.S.C. § 2253(c)(2), and therefore I will not issue a certificate of appealability.

Dated at Milwaukee, Wisconsin, this 14th day of October, 2020.

s/Lynn Adelman
LYNN ADELMAN
United States District Judge

33